**Joe O. WIGGS et al., Plaintiffs,**

v.

**Jack R. COURSHON d/b/a the Twelve Caesars Motel, Defendant.**

**No. 72–745–Civ.**

United States District Court, S. D. Florida, Miami Division.

Feb. 21, 1973.

W. George Allen, Ft. Lauderdale, Fla., for plaintiffs.

Wicker, Smith, Pyszka, Blomqvist & Davant, Miama, Fla., for defendant.

### ORDER

ROETTGER, District Judge.

Defendant has filed a Motion for a new trial, following a verdict for plaintiffs of $25,000 for gross insult suffered as patrons in defendant's motel. The suit was brought by five plaintiffs, all related by blood or marriage but not members of the same household. Joe Wiggs and Barbara Wiggs are both lawyers, he in private practice and she in the Anti-trust Division of the Federal Trade Commission's Office of General Counsel. Arthur W. Bracey and Miriam Bracey are parents of Barbara Wiggs; Mr. Bracey is a school teacher and Mrs. Bracey operates a florist shop. The fifth plaintiff is the son of Joe and Barbara Wiggs, Kevin, 7 years old at the time of the incident. All of the plaintiffs are black and live in Alexandria, Virginia.

This diversity suit was based upon assault although plaintiffs alleged mental anguish and emotional distress as a result of the actions of defendant's employee. At the trial plaintiffs expressly limited their theory of recovery to assault and the trial progressed on that theory. The facts are by and large undisputed.

Plaintiffs had been on a vacation following Mr. Wiggs' graduation from law school and sitting the bar exam and, after a visit to Mexico City, were stopping in Miami Beach for a few days on their return to Virginia. They checked into the defendant's motel on the day in question and went out sightseeing.

Joe Wiggs and Mrs. Bracey came to the dining room ahead of the other members of the party in order to order dinner for everyone. Defendant's waitress who waited on them was Cleo Smith and Mr. Wiggs, acting as family spokesman for the purpose of ordering, expressed interest in the 'special' on the menu. The waitress advised him they were too late for the 'special'. He testified that a single white diner who arrived after him was served a 'special'.

Knowing of the fondness of the family members for seafood, Joe Wiggs then ordered the fisherman's platter. The fisherman's platter normally included shrimps, scallops and fillet of fish. The evidence is undisputed that the waitress went to check to see if all the ingredients for the fisherman's platter were available and it is also undisputed that the platters contained shrimps and fish fillet but not scallops when served. Mr. Wiggs insisted in his testimony that she

had not informed him that scallops were unavailable; she claimed she had informed them extra shrimp portions would be substituted for the missing scallops.

After being served, Mr. Wiggs summoned the waitress to the table with a gesture and inquired as to the missing scallops; the dispute developed and he testified that he told her she had said they could have the seafood platter and if she had said otherwise they would have ordered something else. The waitress then exclaimed: "You can't talk to me like that, you black son-of-a-bitch. I will kill you." The waitress agrees that she used the epithet but testified that she did so in the following frame work: the dispute developed and Mr. Wiggs said, "Well this is not so. You're just telling a damned lie." She retorted by using the epithet. The difference has been resolved by the jury verdict.

Following the outburst Mr. Wiggs testified that the waitress turned and faced a table behind her. All of the plaintiffs testified they did not know what she was going to do, and each one except Mr. Bracey testified that he or she was apprehensive about what the waitress might do. Mr. Wiggs testified that she stood motionless for five to ten seconds and she never made any gesture toward any of the plaintiffs. At this point another waitress and someone from the kitchen rushed up to the waitress and escorted her out of the dining room to the kitchen.

Plaintiffs testified they then left the dining room and went to complain to the manager and that while they were trying to voice their complaint to the person in charge, that the waitress could be heard shouting repeatedly "they are nothing but a bunch of niggers." The waitress denied she ever used the term but insisted she did want to see the person in charge so that she could get in her side of the story. Again, the conflict is resolved in favor of plaintiffs by the verdict. However, the verdicts in favor of plaintiffs Barbara Wiggs, Mr. Bracey and Mrs. Bracey were for no damages, compelling the conclusion that the damages awarded resulted from the insult at the table.[1]

Plaintiffs checked out of the Motel immediately and went to a nearby lodging place; on the following day, Mr. Wiggs came back to the defendant's motel and demanded an explanation and testified that the person in charge attempted to placate him by saying "You shouldn't feel so bad ... she ... is prejudiced against Catholics, Jews and all other kinds of minorities."

After another day plaintiffs cut their vacation short because they were upset over the incident and returned to their homes in Alexandria.

At the close of plaintiffs' case defendant moved for a directed verdict on the bases that there was no evidence of assault, there had been no showing of negligence on the part of defendant in hiring the waitress, and there had been no showing of damages. The court reserved ruling on the motion. At the close of all the evidence defendant renewed his motion for a directed verdict and the court concluded that there had been no evidence whatsoever of assault. Assault requires "an intentional, unlawful offer of corporal injury to another by force, or force unlawfully directed toward the person of another under, such circumstances as to create a fear of imminent peril, coupled with the apparent present ability to effectuate the attempt." McDonald v. Ford, 223 So.2d 553, 555 (Fla.App., 2d Dist. 1969). There was no movement whatsoever by the waitress toward any of the plaintiffs. In fact, she stood motionless, evi-

---

1. Plaintiff's theory of damages as to Kevin was that profanity he has been taught not to use was directed against his father and upset his father but his father was not free to "strike back." Mrs. Wiggs testified he had asked questions about this incident at the table several times.

dently leaning forward at a table where there was nothing which could be used as a weapon. Clearly no evidence was presented by plaintiffs to show an assault by the waitress upon them.[2]

The court also ruled in favor of defendant on the question of negligence in the employment of the waitress. There was no evidence to show any negligence on the part of defendant in this matter because there had been no previous instances on her part showing a likelihood of any such outburst toward a patron. It is a matter of common experience that many persons harbor certain biases and prejudices but they are able to be civil and proper in their conduct, even among persons who are the object of their prejudices.

In addition, there was no showing of any out-of-pocket damage on the part of plaintiffs. At one point the court intervened to inquire if plaintiffs had paid for their motel room or the meal, or if they had incurred any expenses, such as cab fares, in moving to their next accommodations. No charge was made for the lodging or the meal by defendant and plaintiffs had driven their own car to a nearby motel. There was not even a showing that the new accommodations were located so that it required a greater distance to travel to their home eventually.

There is no evidence of pecuniary loss in connection with any of the emotional distress pleaded by plaintiff. No evidence was introduced of doctor's bills, increase in consumption of aspirin or headache tablets, or any pecuniary expense whatsoever. But there was evidence that they had cut short their proposed vacation by two days because of the incident and that they suffered humiliation and emotional distress.

Consequently, the court ruled in favor of defendant on all three bases of defendant's motion for a directed verdict, but still submitted the case to the jury because of dictum in a Florida Supreme Court decision holding such evidence to present a cause of action. Neither party suggested the decision to the court but the dictum is contained in Slocum v. Food Fair Stores of Florida, 100 So.2d 396 (Fla.1950), in which the plaintiff was appealing from a dismissal of her amended complaint wherein she alleged that an employee of the supermarket had told her to find the requested items herself and added, "you stink." The Supreme Court of Florida affirmed the dismissal of the complaint and pointed out that the test for intentional infliction of emotional distress to be that the incident is actionable if the conduct of the defendant is calculated to cause "severe emotional distress" vis-a-vis conduct calculated to cause emotional distress. In passing the court noted the existence of the rule that an insult to a patron by an employee of a common carrier, innkeeper or public utility is actionable but the court stated that it did not propose to extend that rule to the facts or principles of the holding in *Slocum*. Implicit is an acknowledgment that the principle of law as to common carriers and innkeepers is the law in Florida. That dictum of the Florida Supreme Court has never since been cited in Florida.[3] Nevertheless, the dictum of *Slocum* must be

---

2. One may safely conclude that she stood there realizing that she had violated a company policy against engaging in a dispute with a customer for which she would be fired. She was discharged by defendant the following day.

3. The paragraph announcing the dictum cites the Restatement, Sec. 48 and an A.L.R. section which contains only four decisions, all involving common carriers, the most recent of which is dated 1917;

the section has not been cited subsequently in A.L.R.'s supplemental case service. In Odom v. East Avenue Corp., 178 Misc. 363, 34 N.Y.S.2d 312 (Sup.Ct.N.Y.1942), the court denied a motion to dismiss the plaintiffs' cause of action seeking recovery for being denied service in a hotel dining room because plaintiffs were black. The court relied on Boyce v. Greeley Square Hotel Co., 228 N.Y. 106, 126 N.E. 647 (1920), and on common law

considered by this court to be the law of the State of Florida in a diversity suit.

After announcing the court's intention to charge the jury on the principles of *Slocum*, the court permitted plaintiffs to move to amend their pleadings to conform with the proof and proceed on the theory of a gross insult to a patron by an employee of an innkeeper. Although the dictum in *Slocum* only uses the phrase "insult", Section 48 of the Restatement, cited in *Slocum*, describes the conduct necessary for liability as "gross insult". The dictum discusses the rule cursorily while the Restatement reviews it in detail; the court concluded the insult must be a "gross insult" to be actionable under *Slocum*. The jury was so charged and, after deliberating for a considerable period of time, returned the following verdicts: damages of "none" for Barbara Wiggs, Arthur Bracey and Miriam Bracey; $5,000 compensatory damages and $10,000 punitive damages in favor of plaintiff Joe Wiggs; and $1,000 compensatory damages and $9,000 punitive damages in favor of the minor plaintiff, Kevin Wiggs.

■ Florida law requires that there must be compensatory damages before a jury can impose punitive damages. LeJuene (sic) Road Hospital, Inc. v. Watson, 171 So.2d 202 (Fla.App., 3d Dist. 1965). Plaintiffs have not shown any pecuniary damages in this case so we must look to see if there can be justification for compensatory damages because of the nature of the tort or from the interruption of plaintiffs' vacation plans.

■ The court concludes that under Section 48 of the Restatement of the Law of Torts the jury may determine

damages for the emotional distress reasonably suffered by a patron as the result of an intentional gross insult by an innkeeper's employee, even if there has not been the traditional showing of out-of-pocket damages. Any other conclusion would virtually vitiate the section's right of recovery.

As to interruption of vacations, this court has long held to the personal view that tortious interference with a vacation should be an element of damages. If juries can be permitted to use their collective minds to determine pain and suffering, juries can be permitted to award recovery for tortiously terminated or interrupted vacation plans. Obviously vacations have pecuniary value as demonstrated by the extensive collective bargaining on vacation benefits in the "overall package" between "big steel" and the United Steel Workers or the auto manufacturers and the UAW, for example.

The jury heard testimony of plaintiffs that the incident shortened their planned vacation and argument was directed to such testimony. At first blush it seems anomalous that the jury awarded no damages to the three employed plaintiffs but awarded damages in favor of Joe Wiggs, who had not yet commenced his employment after graduating from law school, and 7-year-old Kevin Wiggs. However, Mr. Wiggs testified they took a short vacation several weeks later, after commencing his employment, to make up for their abbreviated Florida vacation.

■ Therefore, the court concludes that compensatory damages can be supported both on the basis of defendant's

---

rights and liabilities of innkeepers, as stated in DeWolf v. Ford, 193 N.Y. 397, 86 N.E. 527 (1908), including: "[O]ne of the things which a guest for hire at a public inn has the right to insist upon is respectful and decent treatment at the hands of the innkeeper and his servants. That is an essential part of the contract, whether it is express or implied.

The right of the guest necessarily implies an obligation on the part of the innkeeper that neither he nor his servants will abuse or insult the guest, or indulge in any conduct or speech that may unnecessarily bring upon him physical discomfort or distress of mind." *Id.* at 530.

tortious interference with plaintiffs' vacation plans and because of the nature of this limited tort itself.

 As to the amount of the verdicts, not only were the judicial eyebrows raised at the size of these verdicts, but the judicial conscience was profoundly shocked. Laskey v. Smith, 239 So.2d 13 (Fla.1970). As reluctant as the court is to interfere with the amounts arrived at by a jury comprising three blacks and three whites, four women and two men, the court concludes that the amounts of the verdicts were outrageously excessive. This jury plainly embarked on a giveaway program far out of line with common sense and experience.

The court condemns the uncivil outburst and rude remarks made by defendant's waitress, but does such an inexcusable insult justify the award of $25,000 under these circumstances? Plainly not. We all have ethnic and racial backgrounds and the court notes that there is at least one and usually several epithets ascribed to any ethnic group members, the use of which offends some members of the group. Despite that, it is certain a line would quickly form by members of any ethnic group to receive $25,000 as balm for an ethnic or racial epithet. The indefensibility of the size of the verdict is plainer still when we place it in context of an epithet delivered in a dispute over the ingredients of a dinner entree when that remark caused neither out-of-pocket expenses to the members of the ethnic group nor any apparent mental or emotional injury.

Consequently this court holds a remittitur to be in order. Defendant's motion for a new trial is granted upon the condition that if plaintiffs stipulate to a reduction of the total amount of the verdicts, each verdict to be reduced proportionately, to $2,500 within ten days, said motion will be denied.